**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**BRYAN AARON SKINNER,**
**Plaintiff,**

**v.** **Case No.: 6:26-cv-2172**

**JOHN W. MINA, in his official capacity as Sheriff of Orange County, Florida, and JUSTIN G. STEMEN, individually,**
**Defendants.**
______________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, BRYAN AARON SKINNER, by and through undersigned counsel, sues Defendants JOHN W. MINA, in his official capacity as Sheriff of Orange County, Florida, and JUSTIN G. STEMEN, individually, and alleges:

## I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983 arising from the warrantless arrest and five-month prosecution of Bryan Aaron Skinner — a retired United States Air Force staff sergeant with no prior criminal history — for a crime that never occurred. The arrest and prosecution rested on a single, uncorroborated accusation by an accuser with a financial motive to remove Mr. Skinner from his own home, and on a charging affidavit in which the arresting deputy fabricated an

inflammatory verbatim "threat" appearing nowhere in the accuser's own sworn statement and concealed every material exculpatory fact known to him.

2. Mr. Skinner was jailed twice, banished from his own home for approximately five months, forced to surrender his lawfully owned firearms, and publicly branded a violent felon — until the State dismissed the case in its entirety. He seeks compensatory and punitive damages, attorney's fees, and costs.

## II. JURISDICTION AND VENUE

3. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4). The Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims.

4. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in Orange County, Florida, which lies within this District. Assignment to the Orlando Division is proper under Local Rule 1.04 because the claims arose in Orange County.

5. Plaintiff is entitled to recover reasonable attorney's fees and costs under 42 U.S.C. § 1988 if he prevails.

## III. THE PARTIES AND THE AGENCY RELATIONSHIP

6. Plaintiff Bryan Aaron Skinner ("Mr. Skinner" or "Plaintiff") is a natural person and, at all times material, was a resident of Orange County, Florida. Mr. Skinner is a retired United States Air Force staff sergeant with no prior criminal history.

7. Defendant Justin G. Stemen (Badge/EID No. 7911) ("Deputy Stemen") was, at all times material, a deputy sheriff employed by the Orange County Sheriff's Office ("OCSO"), assigned to Sector 3, Squad 6, and acting under color of state law and within the course and scope of his employment. Deputy Stemen is sued in his individual capacity. In the alternative, and as set forth below, Deputy Stemen acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

8. Defendant John W. Mina is the Sheriff of Orange County, Florida, and is sued solely in his official capacity as Sheriff. At all times material, the Sheriff was the final policymaker for OCSO with respect to law enforcement policy, training, supervision, and discipline, and was responsible for the acts, customs, policies, and practices of OCSO and its deputies.

9. At all times material, all OCSO deputies and supervisors identified herein acted under color of state law and pursuant to their authority as law enforcement officers of the State of Florida.

## STATEMENT OF FACTS

## IV. BACKGROUND: THE PROPERTY DISPUTE

10. Mr. Skinner owned or held lawful possessory rights to the residential property located at 198 North Goldwyn Avenue, Orlando, Florida 32805 (the "Property"), which had been owned by his late father and was, at the time of the events described herein, the subject of ongoing civil proceedings in Orange County.

11. In or around July 2022, Mr. Skinner permitted Ernest Dequarius Southall ("Southall") — his cousin — and Southall's wife, Shamida Williams ("Williams"), to rent a room at the Property while they recovered from a recent financial hardship. Southall and Williams were to vacate the Property by October 1, 2022.

12. At all times material, Jacob Skinner asserted a competing and illegitimate ownership interest in the Property — an interest that was rejected when the ensuing civil litigation over the Property was resolved in Mr. Skinner's favor, as described below.

13. Both Southall and Jacob Skinner had a direct financial motive to remove Mr. Skinner from the Property in order to seize control of it. The criminal accusation against Mr. Skinner described below was made in the context of, and

arose directly from, this ongoing property and family dispute — a fact Mr. Skinner communicated to Deputy Stemen at the scene, before the arrest.

## V. THE SEPTEMBER 19, 2022 INCIDENT AND DEPUTY STEMEN'S INVESTIGATION

14. On September 19, 2022, at approximately 6:00 p.m., a verbal dispute arose between Mr. Skinner and Southall at the Property concerning the cable bill. Mr. Skinner had asked Southall to step outside to discuss the matter, and also wished to address damage Southall had caused to Mr. Skinner's 2018 Cadillac sedan. The dispute did not involve any physical contact, and no firearm was introduced, displayed, or used by Mr. Skinner at any time. Following the exchange, Southall and Williams walked out of the residence, and Southall telephoned the Orange County Sheriff's Office to report the fabricated accusation; the two waited outside for deputies to arrive. Because nothing had happened — no assault, no altercation, no crime of any kind — Mr. Skinner had no reason to believe that law enforcement had been summoned, was unaware that any call had been made, and remained inside his home going about his business.

15. At approximately 6:03 p.m., Deputy Stemen responded to the Property in reference to the verbal altercation reported in Southall's call, assigned OCSO Agency Case No. 22-58138. Upon information and belief, one or more additional OCSO deputies were present at or around the scene and participated in, advised, or

facilitated the events described herein; their identities and roles will be confirmed through discovery.

16. Upon arrival, Deputy Stemen made contact with Southall, who accused Mr. Skinner of retrieving a black semi-automatic handgun from his bedroom and waving it while it was pointed at Southall. Southall also told Deputy Stemen that he believed Mr. Skinner was dangerous because Mr. Skinner suffered from Post-Traumatic Stress Disorder (PTSD) and allegedly consumed alcohol and carried a firearm around the house.

17. The only claimed eyewitness to the alleged assault was Southall himself. Williams, who was also present at the Property and spoke with Deputy Stemen, stated that she had not seen anything that occurred because she was in another room at the time of the alleged incident; she heard arguing, and Southall then told her to come outside with him while they waited for law enforcement. Williams did not corroborate the assault allegation in any respect.

18. Still unaware that law enforcement had been called — because no crime had occurred — Mr. Skinner walked out of his residence while Southall was still writing his sworn written statement, and approached Deputy Stemen voluntarily when asked to speak with him. Mr. Skinner immediately and specifically denied that any assault had occurred, and, when asked directly whether he had pointed a handgun at Southall, denied doing so. He explained that he had called Southall

outside to discuss Southall's refusal to pay for damage to Mr. Skinner's vehicle, and that no firearm had been introduced at any point. Mr. Skinner further told Deputy Stemen — before the arrest — that the accusation was part of an attempt to remove him from the Property in connection with the ongoing ownership dispute.

19. Mr. Skinner voluntarily and expressly consented to a search of his residence, all adjoining outbuildings, and his vehicle. During the search, Deputy Stemen located and collected a black Springfield Armory XDS-40 semiautomatic handgun from Mr. Skinner's vehicle; the vehicle also contained a rifle case in the trunk holding two long guns, all lawfully possessed. No physical evidence of any assault was discovered.

20. Deputy Stemen then informed Mr. Skinner that Southall had completed a sworn written statement and asked whether Mr. Skinner wished to provide one as well. Mr. Skinner did so. Mr. Skinner's denial was thus not merely oral: he provided Deputy Stemen a sworn written statement, under penalty of perjury, in which he again denied that any argument, altercation, or assault had occurred; stated that he never introduced a handgun and never threatened anyone with one; explained that he had simply wanted to know when Southall planned to pay for the damage Southall had caused to his vehicle; and stated that the home's ownership was in dispute and that he believed the accusation was an attempt to get him out of the way. Deputy Stemen therefore had before him, prior to the arrest, two

competing sworn written accounts — and only one of them, Southall's, came from a person with a financial stake in the outcome.

## VI. THE ARREST WITHOUT PROBABLE CAUSE AND THE DEFECTIVE ARREST AFFIDAVIT

21. At the conclusion of his investigation, the totality of the information actually known to Deputy Stemen consisted of: (a) a single, uncorroborated accusation by Southall, an accuser with a known and disclosed financial motive to fabricate; (b) an affirmative statement by the only other person present, Williams, that she saw nothing; (c) Mr. Skinner's immediate, consistent, and specific denial, given both orally and in a sworn written statement; (d) Mr. Skinner's contemporaneous explanation — repeated in his sworn written statement — of the property dispute motivating the accusation; and (e) the absence of any physical evidence of an assault.

22. No reasonably prudent officer in possession of this information could have believed that probable cause existed to arrest Mr. Skinner for Aggravated Assault With a Deadly Weapon (Firearm) in violation of section 784.021(1)(a), Florida Statutes, or for any other offense. Notwithstanding the foregoing, Deputy Stemen arrested Mr. Skinner for that charge on September 19, 2022, without a warrant.

23. Deputy Stemen made no meaningful effort to resolve the direct conflict between Southall's accusation and the exculpatory evidence before him, and failed to take basic, readily available investigative steps — including assessing Southall's motive in light of the property dispute Mr. Skinner had disclosed orally and in his sworn written statement, or examining the physical scene for evidence consistent or inconsistent with the accusation.

24. In the arrest affidavit he submitted (ICJIS Document No. 995659), Deputy Stemen recounted Southall's accusation and asserted a conclusion of probable cause based solely on Southall's account. Deputy Stemen's sworn narrative included a purported verbatim quotation — that Mr. Skinner, while waving the handgun, yelled: "You think I'm fucking around cuz!" — presented as though drawn from Southall's account. The affidavit did not acknowledge, analyze, or reconcile: the absence of any physical evidence; Mr. Skinner's unequivocal and specific denial, given both orally and in his own sworn written statement; Williams's failure to corroborate; or Southall's substantial, known, and disclosed financial motive to fabricate the accusation.

25. The quoted "threat" does not appear in the accuser's own sworn account. In his sworn written statement, completed in his own hand at the scene, Southall attributed to Mr. Skinner only the words "do you think I am playing" and "do you think I am playing with you" — no profanity, no epithet, and no

exclamation. Deputy Stemen's affidavit transformed that account into a purported verbatim quotation — "You think I'm fucking around cuz!" — attributing to Mr. Skinner profane and menacing language that appears nowhere in Southall's sworn written statement. Deputy Stemen fabricated or embellished the quotation in order to inflame and strengthen the affidavit: the purported verbatim threat was the single most incendiary detail in the narrative and the detail most directly supportive of the element of a well-founded fear of imminent violence.

26. Mr. Skinner did not make the quoted statement, or any statement like it — in either version — at any time. Nor is the quotation consistent with who he is: Mr. Skinner does not curse or use that sort of language.

27. Deputy Stemen's affidavit further incorporated Southall's characterization of Mr. Skinner as "PTSD-stricken" and as someone who habitually drank alcohol and carried a firearm around the house. These characterizations — none of which described criminal conduct — were imported from Southall's self-interested account and served to portray Mr. Skinner as dangerous rather than to establish any element of the charged offense. The use of Mr. Skinner's status as a lawful firearm owner and a post-9/11 military veteran with PTSD as affirmative indicia of dangerousness, and as a basis for probable cause, was constitutionally impermissible.

28. The fabrications, omissions, and distortions in Deputy Stemen's affidavit were material. Had the affidavit omitted the fabricated quotation and disclosed and fairly presented the exculpatory information known to Deputy Stemen — the accuser's financial motive, the absence of corroboration, the absence of physical evidence, and Mr. Skinner's sworn written denial — the affidavit would not have supported a finding of probable cause, and no judicial officer would have found probable cause and no prosecutor would have charged or re-charged Mr. Skinner on its basis. Deputy Stemen made these fabrications and omissions knowingly, intentionally, or with reckless disregard for the truth.

## VII. SUPERVISORY APPROVAL, BOOKING, AND PRETRIAL RESTRAINTS

29. The arrest report reflects that it was reviewed and approved by OCSO Supervisor Daniel Sneed (EID No. 7491) on September 19, 2022 at 10:38 p.m., notwithstanding the evidentiary deficiencies described above, which were apparent on the face of the report itself. Upon information and belief, Supervisor Sneed's approval conformed to, and reflected, OCSO's customs and practices regarding the review of warrantless arrests, as described further below. The extent of Supervisor Sneed's involvement and knowledge will be the subject of discovery.

30. Mr. Skinner was booked into the Orange County Jail at 8:36 p.m. on September 19, 2022, initially with no bond. At first appearance on September 20,

2022, Judge Theotis Bronson entered an Order of Commitment and set bond at $5,000.00. As conditions of release, Mr. Skinner was ordered to have no contact with Southall, to maintain a separate residence, not to return to the Property — his own home — and to surrender his legally possessed firearms within 24 hours. The probable cause determination at first appearance rested on Deputy Stemen's defective affidavit, which was the sole evidentiary submission before the court.

31. From September 20, 2022 forward, Mr. Skinner remained continuously subject to court-ordered restraints on his liberty — including bond conditions, the no-contact order, exclusion from his home, and the surrender of his firearms — all of which flowed from, and were caused by, the arrest and affidavit described above. These restraints constituted a continuing seizure of Mr. Skinner's person pursuant to legal process.

## VIII. THE NO INFORMATION AND INITIAL DECLINATION TO PROSECUTE

32. On October 3, 2022, the Ninth Judicial Circuit State Attorney's Office filed a No Information signed by Assistant State Attorney Lorraine Mae DeLong, stating explicitly: "From the investigation which has been made, it is the opinion of the writer that this case is not suitable for prosecution." This determination was made on the same evidentiary record developed by Deputy Stemen — the same single-witness account, the same absence of physical evidence, and the same

exculpatory information the arresting deputy had before him on September 19, 2022.

## IX. THE RE-FILING, THE CAPIAS, AND THE SECOND ARREST

33. On October 27, 2022, the State Attorney's Office filed a Refiled Information signed by Designated Assistant State Attorney Christopher Lillard Smith. The accompanying Refiled Memorandum stated only that "a review of the case indicates there was sufficient circumstantial evidence" to proceed. No new witnesses had come forward. No new physical evidence had been developed. The re-filing was based entirely on the record generated by Deputy Stemen — the same record that had just been found unsuitable for prosecution — including the defective arrest affidavit and the materially incomplete investigation described above.

34. On October 27, 2022, Circuit Court Judge Mark S. Blechman entered an Order Directing Clerk to Issue Capias, and the Clerk issued the capias on October 28, 2022, commanding Mr. Skinner's arrest on the same charge in the same case, with bond again set at $5,000.00. The capias, like every charging decision and judicial determination in the case, rested on the evidentiary record created by Deputy Stemen, uncorrected by any disclosure of the omitted exculpatory information.

35. On November 30, 2022, Mr. Skinner appeared before Judge Carly S. Wish in Room 370 of the Orange County Courthouse for a hearing in the eviction case Mr. Skinner was then prosecuting against Southall, Orange County Case No. 48-2022-CA-010674-A001OX. An OCSO deputy performing a courthouse security function identified the outstanding capias, confirmed it with the warrants clerk, and, at the conclusion of the hearing, took Mr. Skinner into custody. He was booked into the Orange County Jail at 12:01 p.m. on November 30, 2022, under OCSO Agency Case No. 22-72739. This was Mr. Skinner's second arrest on the identical charge, in the identical case, based on the identical underlying facts — effected in open court, at a hearing in his own eviction case against the very person whose accusation had initiated the prosecution. The deputy who physically executed the capias performed a ministerial function in executing an existing court order and is not named as a defendant; the second arrest and detention were the direct, foreseeable, and proximate result of the conduct of Deputy Stemen described above.

36. The bond conditions imposed following the second arrest again prohibited Mr. Skinner from having any contact with Southall, required him to maintain a separate residence, and prohibited him from returning to his own home.

## X. THE NOLLE PROSEQUI AND FAVORABLE TERMINATION

37. On February 27, 2023, Assistant State Attorney Alethia Simone Rivers filed a Nolle Prosequi in Case No. 48-2022-CF-010934-O as to Count 1, Aggravated Assault With a Deadly Weapon (F3). On the same date, Judge Blechman granted Mr. Skinner's Motion for Modification of Bond Conditions, permitting him to return to the Property.

38. The nolle prosequi terminated the criminal proceedings against Mr. Skinner without a conviction and constitutes a complete, unqualified, and favorable termination of all criminal proceedings against him. The prosecution was not abandoned pursuant to any plea, compromise, diversion agreement, or concession by Mr. Skinner. The entire prosecution spanned more than five months and two separate arrests, all premised on the same uncorroborated, single-witness accusation by a person with an established financial motive to remove Mr. Skinner from his home.

## XI. DISPLACEMENT FROM THE PROPERTY DURING THE PROSECUTION

39. As a direct and proximate result of the arrest and the ensuing bond conditions, Mr. Skinner was excluded from his own home for approximately five months. During his enforced absence, Southall and Jacob Skinner — the very individuals whose accusation and property claims precipitated the prosecution — took control of the Property, and Mr. Skinner's personal belongings were removed

from the Property on multiple occasions. Although the eviction case was resolved in Mr. Skinner's favor on January 31, 2023, he could not lawfully return to his own home until the criminal court's order of February 27, 2023 — the same day the State dismissed the prosecution — confirming that the criminal case itself was the operative mechanism of his displacement.

## XII. JACOB SKINNER'S RELATIONSHIP WITH OCSO

40. Upon information and belief, Jacob Skinner has had a longstanding relationship with one or more members of OCSO. Jacob Skinner has a documented criminal history in central Florida dating back to the 1980s involving narcotics and violent offenses, yet, to Plaintiff's knowledge, has never served a state prison sentence despite repeated arrests and charges. This pattern is consistent with, and upon information and belief is attributable to, Jacob Skinner having served for an extended period as a confidential informant or cooperating individual for OCSO or another law enforcement agency operating in the Orlando area.

41. During the pendency of the criminal proceedings against him, Mr. Skinner received a telephone call from a blocked number. The caller, upon information and belief a law enforcement officer, stated in substance: "Jacob, what are you doing popping up on my computer again? What are you up to now?" This statement — addressed to "Jacob" — reflects a specific, ongoing familiarity with Jacob Skinner in a law enforcement database context and is consistent with Jacob

Skinner having an active informant or cooperating-individual file within OCSO's systems.

42. Upon information and belief, prior to and at the time of the September 19, 2022 incident, Jacob Skinner used his established relationship with one or more OCSO personnel — who may include Deputy Stemen, Supervisor Sneed, or other members of OCSO Sector 3, Squad 6 — to cause or influence the arrest and prosecution of Mr. Skinner, whether through pre-contact communications with responding officers, back-channel credibility vouching for Southall's account, or direct solicitation of law enforcement action in connection with the property dispute. The specific mechanism is not yet fully known to Plaintiff and will be the subject of targeted discovery, including OCSO confidential-informant logs and handler assignment records, internal communications between OCSO personnel and Jacob Skinner, and OCSO computer-access logs for the period surrounding the arrest.

43. The pattern of conduct alleged herein — a one-witness arrest with no physical evidence, a same-night supervisory sign-off despite obvious exculpatory facts, a re-filing on identical evidence after a declination, and the immediate takeover of the Property by the same individuals who made the false accusation — is not consistent with routine law enforcement error. It is consistent with the

deliberate exploitation of an informant relationship, and of OCSO's authority, to weaponize the criminal justice system for private gain.

## XIII. THE SHERIFF'S POLICIES, CUSTOMS, AND PRACTICES

44. At all times material, the Sheriff of Orange County was the final policymaker for OCSO with respect to arrest procedures, probable cause determinations, the preparation and review of arrest affidavits, the supervision and discipline of deputies, and the management of confidential informants and cooperating individuals.

45. Upon information and belief, at all times material, the Sheriff maintained one or more of the following policies, customs, or practices, each of which was so widespread and well-settled as to constitute the de facto policy of OCSO, and each of which was maintained with deliberate indifference to the constitutional rights of persons in Orange County:

a. a custom or practice of effecting warrantless felony arrests based on a single, uncorroborated witness accusation, without corroboration, without meaningful assessment of the accuser's motive or credibility, and without reconciliation of readily available exculpatory evidence;

b. a custom or practice of preparing and approving arrest affidavits that recite only inculpatory accusations while omitting known material exculpatory information;

c. a failure to adequately train deputies in the constitutional requirements of probable cause, including the assessment of witness motive and credibility, the treatment of exculpatory evidence, the duty of candor in sworn charging affidavits, and the impermissibility of treating lawful firearm ownership, military service, or a disclosed mental health condition as indicia of criminality or dangerousness;

d. a failure to adequately supervise and discipline deputies who make arrests without probable cause or who submit materially incomplete or misleading affidavits, including a practice of pro forma supervisory approval of warrantless arrests, as exemplified by the same-night approval of Mr. Skinner's arrest despite deficiencies apparent on the face of the report; and

e. a failure to maintain adequate safeguards governing relationships between OCSO personnel and confidential informants or cooperating individuals, including safeguards against the use of such relationships to instigate or influence enforcement action in private civil disputes.

46. Upon information and belief, the need for training, supervision, and safeguards in each of the foregoing respects was obvious, and the inadequacy of OCSO's training, supervision, and safeguards was likely to result — and did result

— in violations of constitutional rights, such that the Sheriff's failures constituted deliberate indifference.

47. Each of the foregoing policies, customs, practices, and failures was a moving force behind, and a direct and proximate cause of, the violations of Mr. Skinner's rights described herein, including his arrest without probable cause, the initiation and continuation of criminal process against him on a defective evidentiary foundation, his second arrest, and his five-month deprivation of liberty, home, and property. Additional facts concerning OCSO's policies, customs, training materials, disciplinary records, and comparable incidents are uniquely within Defendants' possession and will be developed in discovery.

## XIV. BAD FAITH, MALICE, AND WANTON DISREGARD

48. The conduct of Deputy Stemen described herein — arresting Mr. Skinner in the face of overwhelming exculpatory information, swearing out a charging affidavit that concealed that information, embellishing that affidavit with a fabricated "verbatim" threat appearing nowhere in the accuser's own sworn statement, importing an accuser's prejudicial and non-criminal characterizations of Mr. Skinner's veteran status and mental health as evidence of dangerousness, and doing so, upon information and belief, in furtherance of or under the influence of a private property dispute involving an OCSO-connected individual — was

undertaken in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

## XV. DAMAGES SUSTAINED BY PLAINTIFF

49. As a direct and proximate result of the conduct described herein, Mr. Skinner has suffered and continues to suffer the following damages:

a. Loss of liberty: Mr. Skinner was jailed on two separate occasions — on September 19, 2022 following his first arrest, and on November 30, 2022 following his second arrest — and was subject to restrictive bond conditions and criminal supervision from September 19, 2022 through February 27, 2023, including a no-contact order, a prohibition on returning to his own home, and the compelled surrender of his lawfully owned firearms;

b. Severe emotional distress and psychological trauma: Mr. Skinner, who had no prior criminal history of any kind, suffered severe psychological trauma as a result of two arrests, incarceration, a five-month prosecution, and the loss of his home, and has undergone approximately four years of documented therapy directly related to these events;

c. Economic loss: Mr. Skinner was compelled to cease working in February 2025 as a result of the sustained psychological and

emotional harm caused by the events described herein, together with the costs of defending the criminal prosecution and the civil eviction litigation precipitated by his displacement;

d. Loss of housing and personal property: Mr. Skinner was unlawfully displaced from his residence for approximately five months, and his personal belongings were removed from the Property on multiple occasions during his enforced absence;

e. Reputational harm: Mr. Skinner, a retired United States Air Force staff sergeant with no prior criminal history, was publicly charged with aggravated assault with a firearm — a serious violent felony;

f. Loss of trust in law enforcement and the justice system; and

g. Such other and further damages as will be proven at trial.

## XVI. CONDITIONS PRECEDENT

50. Mr. Skinner timely presented written notice of his claims to the Sheriff of Orange County and to the Florida Department of Financial Services in accordance with section 768.28(6), Florida Statutes. More than 180 days have elapsed since presentation without final disposition of the claims, or the claims have been denied. All conditions precedent to the institution and maintenance of this action have been performed, have occurred, or have been waived.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1983 — FALSE ARREST

**IN VIOLATION OF THE FOURTH AMENDMENT**
**(Against Defendant Stemen, Individually)**

51. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

52. At all times material, Deputy Stemen acted under color of state law.

53. On September 19, 2022, Deputy Stemen seized and arrested Mr. Skinner without a warrant. The arrest was not supported by probable cause — or even arguable probable cause — as to any offense, for the reasons set forth above.

54. The warrantless arrest of Mr. Skinner without probable cause violated Mr. Skinner's clearly established right, secured by the Fourth Amendment to the United States Constitution as applied to the States through the Fourteenth Amendment, to be free from unreasonable seizure. Any reasonable officer possessing the information actually known to Deputy Stemen would have known that arresting Mr. Skinner violated that right.

55. As a direct and proximate result of Deputy Stemen's conduct, Mr. Skinner suffered the damages described in paragraph 49 above.

56. Deputy Stemen's conduct was willful, malicious, oppressive, and undertaken in reckless disregard of Mr. Skinner's federally protected rights, entitling Mr. Skinner to an award of punitive damages.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1983 — MALICIOUS PROSECUTION AND UNREASONABLE SEIZURE PURSUANT TO LEGAL PROCESS**

**IN VIOLATION OF THE FOURTH AMENDMENT**
**(Against Defendant Stemen, Individually)**

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

58. Deputy Stemen initiated, procured, and caused the continuation of criminal legal process against Mr. Skinner by submitting a sworn charging affidavit that contained a fabricated verbatim quotation and omitted every material exculpatory fact known to him, as set forth above.

59. That defective affidavit was the sole evidentiary basis for the judicial probable cause determination at first appearance, the bond conditions and compelled surrender of Mr. Skinner's firearms, the re-filed Information, the capias, Mr. Skinner's second arrest, and the restraints on his liberty that continued through February 27, 2023. Absent the fabricated quotation, and with the omitted exculpatory information disclosed, probable cause would not and could not have been found.

60. Mr. Skinner was seized pursuant to legal process within the meaning of the Fourth Amendment: he was twice jailed and remained continuously subject to court-ordered restraints on his liberty from September 20, 2022 through February 27, 2023.

61. Deputy Stemen acted with malice and without probable cause. Malice is established by, among other things, the fabrication of the quoted "threat," the

concealment of exculpatory evidence in a sworn charging instrument, and the conduct described in paragraph 48 above, and is further inferred from the want of probable cause.

62. The criminal proceedings terminated in Mr. Skinner's favor on February 27, 2023, when the State entered a nolle prosequi, ending the prosecution without a conviction.

63. The acts of the prosecutors and judicial officers who relied on Deputy Stemen's affidavit do not break the chain of causation, because each acted on the record Deputy Stemen created, uncorrected by any disclosure of the fabrication or of the omitted exculpatory information.

64. As a direct and proximate result of Deputy Stemen's conduct, Mr. Skinner suffered the damages described in paragraph 49 above.

65. Deputy Stemen's conduct was willful, malicious, oppressive, and undertaken in reckless disregard of Mr. Skinner's federally protected rights, entitling Mr. Skinner to an award of punitive damages.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983 — MUNICIPAL LIABILITY UNDER MONELL v. DEPARTMENT OF SOCIAL SERVICES**
**(Against Defendant Mina, in His Official Capacity as Sheriff of Orange County)**

66. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

67. At all times material, the Sheriff of Orange County was the final policymaker for OCSO with respect to arrest procedures, probable cause determinations, the preparation and review of arrest affidavits, the training, supervision, and discipline of deputies, and the management of confidential informants and cooperating individuals.

68. As set forth in paragraphs 44 through 47 above, the Sheriff maintained policies, customs, and practices — including the practice of effecting warrantless felony arrests on single, uncorroborated accusations without corroboration or assessment of the accuser's motive; the preparation and approval of one-sided charging affidavits that omit known exculpatory information; the failure to train deputies in the constitutional requirements of probable cause and the duty of candor in sworn charging instruments; the failure to supervise and discipline deputies, including pro forma supervisory approval of warrantless arrests; and the failure to maintain safeguards governing informant relationships — each so widespread and well-settled as to constitute the de facto policy of the Sheriff.

69. The Sheriff maintained each such policy, custom, and practice with deliberate indifference to the known and obvious risk that persons in Orange County would be arrested, charged, and prosecuted without probable cause.

70. Each such policy, custom, and practice was a moving force behind, and a direct and proximate cause of, the violations of Mr. Skinner's Fourth Amendment rights described in Counts I and II.

71. As a direct and proximate result, Mr. Skinner suffered the damages described in paragraph 49 above.

## COUNT IV
## FALSE ARREST AND FALSE IMPRISONMENT UNDER FLORIDA LAW
## (Against Defendant Stemen, Individually)

72. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

73. On September 19, 2022, Deputy Stemen intentionally and unlawfully restrained, detained, and imprisoned Mr. Skinner against his will, without a warrant, without probable cause, and without lawful authority, and thereby caused Mr. Skinner's continued unlawful detention and restraint as described above.

74. The restraint of Mr. Skinner was unreasonable and unwarranted under the circumstances.

75. Deputy Stemen acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, and is therefore personally liable for his conduct.

76. As a direct and proximate result of Deputy Stemen's conduct, Mr. Skinner suffered the damages described in paragraph 49 above.

77. Deputy Stemen's conduct was willful, wanton, malicious, and oppressive, entitling Mr. Skinner to an award of punitive damages.

## COUNT V
## FALSE ARREST AND FALSE IMPRISONMENT UNDER FLORIDA LAW
## (Against Defendant Mina, in His Official Capacity — Pleaded in the Alternative)

78. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

79. This Count is pleaded in the alternative to Count IV. If and to the extent Deputy Stemen's conduct is found not to have been committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, then Deputy Stemen acted within the course and scope of his employment with the Sheriff.

80. Acting within the course and scope of that employment, Deputy Stemen intentionally and unlawfully restrained, detained, and imprisoned Mr. Skinner against his will, without a warrant, without probable cause, and without lawful authority.

81. The Sheriff is liable for the torts of his deputies committed within the course and scope of their employment under the doctrine of respondeat superior.

Sovereign immunity is waived to the extent provided in section 768.28, Florida Statutes.

82. As a direct and proximate result, Mr. Skinner suffered the damages described in paragraph 49 above.

**COUNT VI**
**MALICIOUS PROSECUTION UNDER FLORIDA LAW**
**(Against Defendant Stemen, Individually)**

83. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

84. An original criminal judicial proceeding — State of Florida v. Bryan Aaron Skinner, Orange County Case No. 48-2022-CF-010934-O — was commenced and continued against Mr. Skinner.

85. Deputy Stemen was the legal cause of the commencement and continuation of that proceeding: his charging affidavit — containing a fabricated verbatim quotation and omitting the material exculpatory information known to him — was the sole evidentiary basis for the arrest, the judicial probable cause determination, the re-filed Information, the capias, and the second arrest, and he did not thereafter correct it.

86. The criminal proceeding was commenced and continued without probable cause.

87. The criminal proceeding ended in a bona fide termination in Mr. Skinner's favor on February 27, 2023, when the State entered a nolle prosequi, ending the prosecution without a conviction and without any plea, compromise, diversion, or concession by Mr. Skinner.

88. Deputy Stemen acted with malice, both actual and legal: actual malice is established by the fabrication of the quoted "threat," the concealment of exculpatory evidence in a sworn charging instrument, and the conduct described in paragraph 48 above, and legal malice is inferred from the want of probable cause. Deputy Stemen thereby acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, and is personally liable.

89. As a direct and proximate result, Mr. Skinner suffered the damages described in paragraph 49 above.

90. Deputy Stemen's conduct was willful, wanton, malicious, and oppressive, entitling Mr. Skinner to an award of punitive damages.

## COUNT VII
## MALICIOUS PROSECUTION UNDER FLORIDA LAW
## (Against Defendant Mina, in His Official Capacity — Pleaded in the Alternative)

91. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

92. This Count is pleaded in the alternative to Count VI. If and to the extent Deputy Stemen's conduct is found not to have been committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, then Deputy Stemen acted within the course and scope of his employment with the Sheriff, and the malice element of this claim is supplied by legal malice, which under Florida law may be inferred from the want of probable cause and does not require proof of actual malice or ill will.

93. Acting within the course and scope of that employment, Deputy Stemen was the legal cause of the commencement and continuation of the criminal proceeding against Mr. Skinner, which was commenced and continued without probable cause and which ended in a bona fide termination in Mr. Skinner's favor on February 27, 2023, as set forth above.

94. The Sheriff is liable for the torts of his deputies committed within the course and scope of their employment under the doctrine of respondeat superior. Sovereign immunity is waived to the extent provided in section 768.28, Florida Statutes.

95. As a direct and proximate result, Mr. Skinner suffered the damages described in paragraph 49 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bryan Aaron Skinner demands judgment against Defendants as follows: (a) compensatory damages against all Defendants; (b) punitive damages against Defendant Stemen; (c) reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; (d) pre-judgment and post-judgment interest as allowed by law; and (e) such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated: September 21, 2026.

**Respectfully submitted,**

/s/ Brandon E. Meeks
Brandon E. Meeks, Esq.
Florida Bar No. 1068353
The Meeks Law Firm, PLLC
1446 Marion Avenue
Tallahassee, Florida 32303
Telephone: (850) 688-8396
Brandon@TheMeeksLawFirm.com
Lead Counsel for Plaintiff